BRAMLETT *v.* THE SOUTHERN MUTUAL AID ASSOCIATION.

**Insurance Co. — Voluntary Association — Distribution of Funds.**

A voluntary mutual association, having collected funds from its members holding policies under a by-law appropriating them to the payment of certain classes of policies *pro rata,* cannot be compelled to withdraw them from the objects for which they were paid at the suit of a policyholder, who, under the rules of the company, was only entitled to a *pro rata* distribution and to pay his policies in full. Such policyholder, if he participates in the distribution, must do so by reason of the regulations of the company under which it was collected.

**Same — Injunction.**

A bill filed by such policyholder, seeking to enjoin the association from paying out such funds in accordance with its rules in force when the money was paid in, and the sole object of which is to subject such funds to the exclusive payment of his policy, cannot be maintained, and an injunction granted should be dissolved.

Bill in chancery by appellant, Bramlett, against The Southern Mutual Aid Association, a matrimonial mutual insurance company. From a decree dissolving his injunction complainant appeals. Affirmed.

The bill alleges that complainant applied for membership in said association on September 1, 1881, and on the 2d of September, 1881, he was admitted to membership and two certificates were issued to him of $1,000 each, one in class A, the other in class B; that he continued his membership, complying with all the rules and regulations of the company, up to the 4th day of October, 1882, at which time he married and made proof of his marriage, and his

policies thereby matured; that said association, in accordance with its charter, obligated itself to pay him a sum certain on his marriage, to wit: $240 for the first six months and $40 per month for each month he remained a member thereafter, and under the terms of his policy he was entitled to $520 on each policy, or $1,040 on both, which, under the by-laws of the association at the time his policies were issued, was to be raised by assessments on its members for his benefit; and that it did raise the sum of $9,506 in that way, which it still had on hand; that this sum was collected November 6, 1882, and in addition it had in hand the sum of $22,900.44, derived from pervious assessments, out of which complainant and other policyholders whose policies had matured are entitled to be paid; that said association holds these sums as trustee for the benefit of such policyholders; complainant prays for a writ of injunction restraining the defendant from paying this money out until his claim is paid, and that so much of it as is necessary be applied to the payment of his claim in full.

The charter of the association authorized it "to establish a benefit fund, from which, on the satisfactory proof of marriage of a member who has complied with all the regulations of the association, shall be paid a sum certain."

Articles 8 and 9 of the policies sued on are as follows:

"Marriage benefits of this association are to be paid out of the marriage fund, which is a trust fund, and held sacred for that purpose. This fund shall be created by, and consist of, the advance marriage assessments collected from the members at the time of joining the association and subsequent assessments, which shall be collected from the members, when the payment of approved marriage claims will reduce the marriage benefit fund to less than $1,000."

"Article 9. Within sixty days after receipt of satisfactory proof of the marriage of a member, properly made out on blanks furnished by the officers for the purpose, the association will pay, at their office at West Point, Miss., a sum to be ascertained as follows: No member will be entitled to any benefit until he shall have been in good standing as a member of this association for six months prior to marriage, and at the expiration of six months from the date of the certificate he shall be entitled to $240 upon presentation of proof of marriage, and for every month after the

first six months of membership until marriage, he shall be entitled to $40 per month in addition to said $240; provided, that said sum shall not at any time exceed $1,000."

By the terms of his application for membership complainant agreed that he would fully obey the constitution and laws of the association, or that may be thereafter made, and that a compliance on his part with all laws and regulations then in force, or that might be thereafter enacted is the express condition on which he was to participate in the mutual marriage benefit fund.

On the 11th day of January, 1882, the association adopted a by-law to the effect that in the future no more than seven assessments would be made upon its members in each class in any one month, and in the event that these assessments should be insufficient to pay in full all marriages that might occur in the month, that those who did marry in that month should take *pro rata* the fund so raised in full satisfaction of their claims. Defendant answered the bill, admitting most of the allegations, but setting out this by-law, claiming that complainant and those holding like certificates, were bound by it and not entitled to be paid in full in the order of the maturity of their certificates, but the $9,506 should be paid to them *pro rata,* or such of them as married in the same month, and that the $22,900.44 derived by assessments upon the members, should be withheld to pay claims which might thereafter arise. Complainant contended that he was entitled to payment according to the terms of his certificates and the by-laws in force at the time his certificates were issued.

APPEALED from Chancery Court, Clay county, FRANK A. CRITZ, Chancellor.

Affirmed, February 19, 1883.

*Attorneys for appellant, McIntosh & Williams, T. S. White, and Fred Beall.*

*Attorneys for appellee, Barry & Beckett.*

Brief of McIntosh & Williams:.
\* \* \* "By the terms of his policies it is provided, article 1: "Assessments shall be collected of members for the purpose of pay-

ing marriage benefits when the payment of such claims *will reduce*
the marriage benefit fund in bank to less than $1,000."

The charter of the association authorized it "to establish a benefit
fund, from which, on the satisfactory proof of marriage of a mem-
ber who has complied with all the regulations and requirements
of the incorporation, shall be paid a *sum certain,*" etc.

By article 8 of the policy, it is provided that "marriage benefits
of this association are to be paid out of the marriage fund, which
is a *trust fund,* and held sacred for that purpose. This fund shall
be created by, and consist of, the advance marriage assessments col-
lected from the members at the time of joining the association, and
*subsequent* marriage assessments, which shall be collected from
the members, when the payment of approved marriage claims will
reduce the *marriage benefit fund* to less than $1,000." Article 9
provides as follows: "Within sixty days after receipt of satis-
factory proof of the marriage of a member, properly made out on
the blanks furnished by the officers for the purpose, the associa-
tion shall pay, at their office in West Point, Mississippi, a sum
to be ascertained as follows: No member will be entitled to any
benefit until he shall have been in good standing as a member of
this association for six months prior to marriage, and at the expira-
tion of six months from the date of certificate he shall be entitled
to $240 upon presentation of proof of marriage, and for every
month after the first six months of membership until marriage he
shall be entitled to $40 per month in addition to said $240; *pro-
vided* said sum shall not at any time exceed $1,000, said *benefits*
as above to be paid by the officers of this association upon receipt
of assessments made upon each member of this association, under
rules governing such assessments and payments, and no member
shall be assessed more than one time for payment of *same benefit,*
and in the event one assessment *from each member* does not pay
the amount to which the beneficiary may be entitled, he shall
receive said one assessment in full satisfaction of claim against
this association."

Another one of the rules and regulations of said association, in
force at the time appellant joined said association, was as follows:
"When a member marries he is retired from the association as soon
as the proofs, made in accordance with the regulations governing
same, are received at the headquarters of the association;" and,

furthermore, "that each assessment shall be for one dollar and t-n cents in each class. The first assessment shall be made the first of December, and as often thereafter as required."

By the terms of the application for membership in the association, the appellant agreed as follows: "I will faithfully obey the constitution and laws of the association, or that may hereafter be made by the officers of said association, and that a compliance on my part with all of the laws, regulations and requirements now in force, or that may hereafter be enacted by said association, is the express condition upon which I am to be entitled to participate in the mutual marriage benefit fund, in the amount named in the constitution and laws of the association."

This application was dated September 1, 1881, and a policy in each "class A" and "class B" was issued by the association to appellant September 2, 1881. The foregoing constitutes the contract between the parties as well as all the laws, rules and regulations in force by the association at the time the contract was made.
\* \* \*

But the defendant sought, by its answer, to avoid its contract with appellant on the ground that on the 11th day of January, 1882, it issued a circular to its members, which it says was a by-law, wherein was stated that in the future no more than seven assessments should be made upon its members in each class in any one month, and in the event those seven assessments should be insufficient to pay in full *all* marriages that might occur in the month, then in that event the parties marrying should take *pro rata* the fund so raised in full satisfaction of their claims; but the officers of said association, in said circular, gave it as their *opinion* that the said maximum assessments, *seven,* would be sufficient to pay *in full* all marriage proofs filed in any month, and that the said circular further announced that the association would retain one-third of all assessments made in the treasury for the purpose of creating an equalization fund. \* \* \* This paper is dated January 11, 1882, and signed by Geo. P. Herndon, President, and R. M. Levy, Secretary, and is called a by-law. \* \* \*

The defendant insists that inasmuch as copies of these papers, which they call by-laws, were mailed to the appellant, and the appellant afterwards paid all the assessments made by the association, and did not *express* any dissent or objection to them, that

he is thereby estopped from now saying that he should not be bound by them. We insist that we are bound only by such by-laws, rules and regulations of the association that were in force at the time we joined, and such as were subsequently made which do not *impair* the obligation of *our contract with the association.* \* \* \*

The money in the hands of the association is a *trust fund,* so denominated in the policy. The officers are *trustees.* There can be no question as to the jurisdiction of the matter by a Chancery Court.

Brief of T. S. White:

\* \* \* It will be seen that under appellant's policy, as originally made, and under the rules and regulations then in force, he is entitled to be paid in full, in the order in which his policy matured. This is not only so in his contract, but in the absence of any express provisions to that effect in the contract, he would have this right. In an insolvent mutual life insurance company it has been held that death losses are to be paid in the order in which such claims mature. Vannetts *v.* N. J. Mut. Ins. Co., 34 N. J. Eq. Rep., p. 13; 78 N. Y. 114.

It is said that they are preferred creditors in the order in which their claims mature, and cannot be called upon to share *pro rata.* We especially invite the attention of the court to this case. Mayer *v.* Attorney-General, 32 N. J. Eq. Rep. 815.

While it is not contended by appellee that, under our contract as originally made, we would not be entitled to have our claim paid in full, and that that was the original plan, yet it is insisted that, by virtue of certain rules and regulations made on the 11th day of January, 1882, after our contract was entered into with the company, that a change was made by which members, instead of being paid in full and in the order in which their policies matured, that all the beneficiaries of any one month should be required to share the funds raised for such month *pro rata.* This does not only affect our rights with reference to a participation in the assets, but requires us to pay an assessment on marriages which occurred subsequent to ours during the same month. Under our contract and under the rules in force when appellant became a member, we only paid on marriages anterior to our own. The question to be determined is, can the rules or modifications be made

to operate against us; in other words, can our rights, already vested by virtue of our contract, be divested and destroyed by the association at its will without our consent? I think not, as it violates a fundamental principle. If the association had the right to change our contract in these particulars, it follows that it possessed the power to absolutely destroy it. It was a creature whose temporary existence was dependent on the will of the officers of this association.

By-laws passed subsequent to the issuance of policy in a mutual company, affecting the policy, are not binding on the policyholders. Ins. Co. *v.* Harvey, 45 N. H. 300; Ins. Co. *v.* O'Conner, 17 Penn. 136; N. E. Mut. Co. *v.* Butler, 34 Me. 451.

A by-law which is contrary to the principles of the common law or to the policy of the State as an *ex post facto* by-law is void. Pulford *v.* Fire Department, 31 Mich. 458.

If the rules of a mutual insurance company are changed after the insurance is obtained, they cannot, without the express consent of the assured, be held to vary the terms of his policy or contract entered into. The company has no right without his consent to impose new conditions affecting his rights under the contract. Bliss on Life Ins., p. 734, § 463; May on Ins., p. 687, § 552.

Though a member of the company, the assured stands so far as relates to any change in the contract made with it in the same position as a third person, etc. Bliss on Life Ins., p. 735.

By-laws which contravene the fundamental rules of the common law are void. People *v.* Kep, 4 Cow. 382; Kennebec *v.* Portland R. R. Co., 31 Me. 470.

To say that our contract should be so changed that we would be required to receive a much less sum than we contracted to receive and that we should be required to pay assessments on a large number of marriages subsequent to ours, when our contract says that after our proof of marriage is filed that no more assessments can be levied upon us, would be unreasonable and harsh, and by-laws must be reasonable to be binding. Elwood *v.* Bullock, 62 B. 383.

By-laws disturbing vested rights and *ex post facto* by-laws are void. Morawitz on Private Corporations, § 368; People *v.* Crockett, 9 Cal. 112; Kent *v.* Quicksilver M. Co., 78 N. Y. 159.

The officers of a corporation are the trustees of stockholders

and can only act for the interest of the *cestui que trust,* and being trustees, their action will be scrutinized and they not allowed to profit at the expense of the *cestui que trust.* These officers could only have had one motive in getting up this *pro rata* plan, and raising a large sum of money at the expenes of holders of matured claims, and that motive was to perpetuate this most iniquitous scheme in that they could grow rich at the expense of the dupes of the country. If they were raising a fund to be distributed every three months, why did they, on August 1, 1882, change from three months to six months? It is obvious that they wanted to extend the life of this concern beyond the 1st of January, 1883, in order that they might collect the annual dues which were payable on the 1st of January of each year. Occupying the relation of trustees, they will not be allowed to do this. 2 Waits Actions and De., 341.

But we are told that we are estopped, having allowed them to go on without objection. We had no other alternative but to go on. It was go on or forfeit everything we had paid into the association. What could we do? Had we objected, they would have said we have only fixed a maximum assessment that is to your advantage. The association had the right to adopt this *pro rata,* and the only question is, as to how and upon whom will it operate. It is binding upon the new members, because they have so contracted, and this is the first time that we could complain because our claim had not matured.

We are told that it would be unjust to the new members, because they joined the association on the faith of the new rules. They were charged with a knowledge of our rights, and knowing what our rights were when they joined, they will not be heard to complain. Besides, we have discharged our duty to these new members, every one, whose policy matured before ours, we paid an assessment for his benefit, and now if there is not sufficient money to pay him in the treasury, these officials must make an assessment for his benefit. Assent to by-laws passed after policy is issued will not be presumed. Angell & Ames on Cor., 338.

This fund of $22,900.46, raised by assessments on previous months as an equalization fund, is not authorized by the charter, and, besides, how does the court know that there will be any policies in force against the company and matured for the months of November and December? The charter provides for a benefit

fund to be paid out of on proof of marriage, and this fund being in the treasury, it.is necessarily a marriage benefit fund. It was raised by assessment just as is provided in our policy, and is therefore subject to our claim. A corporation cannot enlarge its powers by a by-law. When a company was authorized to issue policies as a fire insurance company, it was held not to include losses by lightning. Andrews *v.* Union Mut. Fire Ins. Co., 37 Me. 256; 2 Waits, A. & D. 329.

The court will see that the assessments under the new rule were not made *in solido,* but seven assessments of $1.00 each were made on each member in each class, and 70 cents taken out for expenses. They could only take out 10 cents on each assessment.

I think there is nothing in the proposition that the Chancery Court had no jurisdiction. It is a trust fund, and a specific fund out of which we are entitled to be paid. It is held in trust, and we have a right to look to the fund.

Brief of Fred Beall:

\* \* \* A corporation can make no by-law contrary to law, good morals, or public policy. Sayre .*v.* Louisville Union Ben. Assn., 1 Deu. (Ky.)

An unreasonable by-law will be held bad, and cannot be enforced. Elwood *v.* Bullock, 6 Q. B. 383; People *v.* Throop, 12 Wend. 183.

Corporations seeking to enforce by-laws must show their power to pass their by-laws, and that the by-laws were actually passed, and must bring themselves by proof within the power. Durham *v.* Trustees of Rochester, 5 Conn. 462; Taylor *v.* Griswold, 2 Green, 223.

The appellant is not estopped to enforce the contract as originally made between him and the association. Davis *v.* Bank of England, 2 Ring. 393; Taylor *v.* Midland R. R. Co., C. Jur. N. S. 595.

The officers of the association could do nothing to impair the rights of one of its members, and had no such power as is claimed for them in the answer and cross bill, and upon this branch of the case I especially invite the attention of the court to Eidman *v.* Benmen, 58 Ill. 444, also reported in ·11 Am. R. 90, to which there is a note of value.

Brief of Barry & Beckett:

\*   \*   \*   We say that appellant cannot recover for three reasons: First, because the company, subsequent to this policy, made a new by-law, by which it was provided that instead of $1.10 on each marriage, that they would not levy an assessment greater than $15.40 for any one month, and that the fund raised from this fund should be paid *pro rata* among all who married during that month.

Appellant denies that this by-law can affect his policy, which he claims is a contract that cannot be violated. But we say that to make this change in the by-laws does not impair any *contract* of appellant, for he has contracted to abide by any by-law made or *to be made* by the officers of the company, and has made that an express condition on which he is to share in anything, and hence he has contracted in advance to abide by the very by-law which he is now assailing. Appellant contends that his contract does not require him to submit to a by-law that would change the by-law in force at the time he joined to levy an assessment of $1.10, but we cannot see where he gets his argument, for the *contract* of appellant is to *obey all by-laws that might thereafter be made,* and this is a by-law that was thereafter made.

It is certainly settled by the high authority of the Supreme Court of the United States, a court which prides itself on sustaining the obligation of contracts, that under such a policy the appellant is "bound by the by-laws of the society, as far as is consistent with the nature of its institution." Mut. Assurance Co. *v.* Koon, 7 Cr. 396.

When the policy and application refer to each other, they make one contract. Herman on Estoppel, pp. 517-8; Carson *v.* Jersey City Ins. Co., 43 N. J. Eq. 300.

The answer shows that all the by-laws and changes were duly made by said association. There is nothing to show that the officers ever organized as a body, but where the charter names the officers, it is not necessary for them to organize. Stoop *v.* Greenburgh, Plk. Rd. Co., 10 Ind. 47.

However, there is no dispute about this, for if the change in the by-laws was not made properly, neither was the original by-law, and hence appellant would fail to establish any by-law at all under which he could claim, except the mere discretion of the officers, and hence would have no *locus standi.*

We think appellant is estopped both by acquiescence and on the ground that he cannot now enforce his contract without injury to third persons, whom he has permitted to change their positions without notice of his intended actions.    *    *    *

Appellant claims that a mutual insurance company cannot pass a by-law impairing the obligation of a contract, and then *assumes* that the passage of the new rule of $15.40 maximum and reserve fund *impaired* the obligation of his contract.   The principle is true as an abstract proposition, but when we come to its application there are two things to be considered:   First, does it impair a *contract,* and, second, does it *impair* a contract?   These two things must concur.   We have shown that appellant agreed to abide by all by-laws to be thereafter passed, and hence that his *contract* was not impaired.

Now, if we can forget for a moment that appellant agreed to abide by this *very by-law in his contract,* and that he had a *contract* which could be impaired, it does not follow that it was *impaired* because a subsequent by-law was passed in some way affecting it. He must show wherein it was *impaired,* for the corporation had the undoubted right under its charter "to pass such rules, regulations, and by-laws, as they might deem for the best interest and government of the corporation."

The only reason that appellant could object to it would be that it would *impair his rights,* previously acquired.   To assume that every by-law would impair his rights would deny the corporation to pass by-laws at all after he had joined.   And let us see if his right was *impaired.*   It will be observed that the corporation was not liable *per se* to him for any amount, but that he was to be paid a certain ascertainable (not ascertained) sum to be raised by an assessment of $1.10 on each member, and that he was to receive this one assessment of $1.10 on each member, and that no member was under either any *moral or legal obligation* to pay this $1.10, but was at perfect liberty to withdraw and forfeit his membership by non-payment of his fees or assessments.

If appellant's view is true that each assessment for each marriage must be $1.10, then he has shown no legal obligation on any member to pay this $1.10, and no liability of the company, outside of the assessment, and no dissentient member but himself, and how can this court presume that a single member would re-

spond for such an assessment? In fact, every presumption is against it, for all the balance of the old members, and all the new members, have abandoned the old plan, and entered on a new plan of insurance, and there is no legal obligation on them to respond to assessments under the old plan, and it certainly cannot be presumed that they would take the money out of their pockets and give it to appellant, *to raise a monument over a dead by-law with,* but would rather leave him like Marius sitting amid the ruins of Carthage, and bending down over buried hopes.

But it is said that an assessment is only to be made when the amount in bank falls below $1,000, and that there is now a fund on hand amounting to $32,000, and hence the money is already in the treasury, and all the company has to do is to pay it out to appellant.

It would be strange if the Supreme Court should send a man to the penitentiary for obtaining money under false pretenses, and then turn round and endorse a proposition that an insurance company could obtain money under false pretenses from its members, and the court should then assist them in carrying out the false pretense, for it must be remembered that this is a case of *voluntary payments,* and not premium notes which the insured are legally bound to pay, and which can be collected at law. There, though the company may attempt to collect for one purpose, the law applies the fund to another purpose, and thus each member is bound to know, and in that case if the premium notes are allowed to be diverted to illegal objects, the fund is dissipated, and the parties without remedy, for when the notes are exhausted the fund is gone, and hence each member interested is entitled to have the fund properly applied.

But in this case the advance assessment of $1.10 on each member for December, 1881, was soon afterwards properly paid out to members marrying before the by-law was changed, and that left the company without any involuntary fund from its members. The fund now on hand is a *voluntary* fund, paid by the members for a certain purpose, and with no *legal or moral* obligation on them to have paid it for any other purpose, and how can this court now take this fund and apply it to the payment of a policy, which the members were under no legal or moral obligation to pay in the first instance? If appellant claims the barren right to have

an assessment of $1.10 on each member levied for his benefit, he might compel the officers to make the levy, but the members are under no obligation to pay it, and when the drag-net was thrown it would come back, not like the nets of Peter, James and John, but laden with his own $1.10. No fund has ever been raised to pay his policy.    *    *    *

OPINIION—COOPER, J.:

The funds sought to be subjected by the appellant to the payment of his claim were not raised under the scheme in force at the date of the issuance of the policies, but were paid by others holding policies in the company under a by-law appropriating them to the payment of certain classes of policies *pro rata.*

To withdraw these funds from appropriation to the objects for which they were paid would be to infringe upon the rights of those who, under the rules of the company at the time of the collection of the money, were equally with complainant entitled to it.

If the fund has been unlawfully collected, it ought to be returned to those who contributed it, and if it has been rightly collected, it ought to go to the persons for whose benefit it was paid.

The complainant (appellant), if he participates in its distribution, must do so by reason of the regulation of the company under which it was paid. If he desires to disclaim any interest in it, and to insist upon the performance of the contract made by the officers of the corporation with him, he may by proper proceedings try his right to such relief; but the sole object of this bill being to subject the funds now in the hands of the company to the exclusive payment of his policies, and held by it in trust for others equally with him, the injunction was properly dissolved, and the decree is

*Affirmed.*